United States District Court
Eastern District of Michigan

United States of America,

v.

Patrick Wimberly,

Defendant.

_____/

Hon. Linda V. Parker

Case No. 23-CR-20562

## Government's Sentencing Memorandum

When they elected him as mayor, the residents of Inkster, Michigan, trusted Patrick Wimberly to prioritize the needs of the city above his own personal enrichment. Unfortunately, Wimberly abused this trust by demanding $100,000 in bribes from an investor who wanted to develop a parcel of vacant land. Wimberly's play-to-pay scheme elevated his own interests above his constituents, and betrayed the public. The government requests a sentence of 37 months to, among other things, reflect the seriousness of the offense, provide just punishment, and to afford adequate deterrence to the defendant and others who are tempted to betray the public's trust in this manner.

## I.   Factual & Procedural History

1

A. <u>Mayor Wimberly and Inkster's Neighborhood Stabilization Program</u>

Wimberly was elected mayor of Inkster in 2019. At the time, Inkster was soliciting applications from developers to acquire and rehabilitate tax-foreclosed properties under Inkster's Neighborhood Stabilization Program (NSP). ([https://www.cityofinkster.com/DocumentCenter/View/7109/Neighborhood-Stabilization-Program-PDF](https://www.cityofinkster.com/DocumentCenter/View/7109/Neighborhood-Stabilization-Program-PDF)). The purpose of the program was to provide emergency assistance to communities with high rates of abandoned and foreclosed homes. Before a piece of property was awarded to an interested buyer, however, it needed to be approved by a committee chaired by Wimberly. Rather than use this position of power to improve Inkster, Wimberly instead abused this position and sold his influence to the highest bidder.

B. <u>Wimberly's Pay-To-Play Scheme</u>

In the spring of 2022, a local investor approached Wimberly's executive assistance, Saif Alsenad, about buying a vacant 13-acre parcel in Inkster that was owned by the city. The investor planned to use the property for a towing and/or an auto repair shop. Alsenad told the investor that Wimberly expected to receive cash bribes in exchange for

2

Wimberly's assistance in acquiring the property. Eventually, the local investor introduced Wimberly to Person A—the buyer of the 13-acre lot, and the person who would satisfy Wimberly's demands for cash bribes.

In August 2022, at Person A's first meeting with Wimberly, Wimberly demanded $100,000 in cash bribes from Person A—$50,000 up front, and $50,000 after the bid was awarded. Rather than pay the amount in a lump sum, Person A requested the initial bribe payments be made in $5,000 monthly increments, eventually increasing to $10,000 per month. During these meetings Wimberly repeatedly told Person A that he could control the vote of the Inkster City Council for the sale and use of the 13-acre property.

On September 29, 2022, Person A made his first $5,000 cash payment to Wimberly who responded that he and Person A were now "locked in." Person A promised to come back in a month for the next payment.

C. Wimberly Continues Demanding Monthly Bribe Payments Totaling $50,000

After this first payment, there were others. The second one happened on November 18, 2022. This time, Person A met with Wimberly at a local strip club. Person A asked Wimberly if Wimberly

3

wanted the second $5,000 payment at that time. Wimberly responded: "you want that 13 [acre property], ain't nothing to talk about." Person A then put an envelope with $5,000 cash on Wimberly's knee. On December 5, 2022, Wimberly and Person A met again at the strip club. Like before, Person A gave Wimberly $5,000 cash.

In January 2023, Wimberly messaged Person A demanding an increase in the monthly payments: "for the record we said double up on services starting in January." But Person A pushed back stating they had agreed to "do five in January" and then for "February, March, April" the payments would be "ten, ten, ten" and continue "until we hit our 100 mark." Person A brought the January bribe payment to Wimberly's house, which he delivered to Wimberly in his driveway.

In advance of their February meeting, Person A sent Wimberly a text message "to touch base and make sure our proposal gets the proper attention that is required . . . to win the bi[d]." They met on February 23, 2023, at a local bar in Detroit. Person A again passed an envelope of $5,000 cash to Wimberly. Wimberly did not count the cash in front of Person A but likely looked at it later and realized that it was less than the $10,000 he expected. After messaging Person A and explaining the

two had agreed to "double up in February," Person A apologized for the mix-up, and the next day gave Wimberly another $5,000 in cash.

In March, Wimberly messaged Person A to request a meeting to "see what's going on…" Wimberly further explained he had planned a birthday party for himself and "was going to use [the money]…to take care of some of the expenses." A few days later, Wimberly persisted, explaining that he and Person A agreed on payments in "30-day increments." Wimberly's demands continued until Person A relented and gave Wimberly $10,000 in cash.

Person A and Wimberly met again in April, and Person A informed Wimberly that he needed additional time to get his plans together for the vacant parcel. In response, Wimberly told Person A that he had others interested in the lot and needed to provide a reasonable explanation to "keep them quiet." Later, when Person A was in Wimberly's car, Wimberly opened his center counsel and Person A placed an envelope with $10,000 cash inside. In total, Person A paid $50,000 in cash bribes to Wimberly before he was arrested by the FBI.

D. Defendant Pleads Guilty

On September 25, 2024, Wimberly pleaded guilty to count one of

5

the indictment which charges him with committing bribery concerning federal funds.

## II.    Guidelines

The probation department calculated a guideline range of 37 to 46 months in prison (21/I). The government agrees with the probation department's calculations and requests a sentence at the bottom of the guideline range.

## III.   Argument

Title 18, United States Code, Section 3553 details several considerations for the Court to take into account when imposing sentence. For Wimberly, the most important are the need to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to promote adequate deterrence. 18 U.S.C. §§ 3553(a)(1), (a)(2)(A), and (a)(2)(B). The sentence imposed by the Court should also consider avoiding sentencing disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6).

A. <u>The Seriousness of Defendant's Crimes, Promoting Respect for the Law, and Providing Just Punishment</u>.

There is no question that Wimberly's crimes are serious. The

defendant—an elected public official—sold his influence and abused the trust of Inkster residents only to enrich himself. Wimberly knew it was wrong to demand cash to facilitate the sale of city-owned property but he chose to elevate his needs above the betterment of the city he was elected to serve. For that he should be punished. 18 U.S.C. § 3553(a)(2)(A). A sentence of 37 months reflects the seriousness of the defendant's conduct while providing just punishment for his crimes.

### B. Affording Adequate Deterrence to Criminal Conduct.

Specific deterrence is an important consideration in every case. Thankfully Wimberly's foray into politics has come to an end. This alone will provide an obstacle to any future attempts by Wimberly to take advantage of unwitting members of the public. General deterrence is also critical because, sadly, Wimberly's crimes are not an anomaly among elected officials. Consequently, a significant sentence is necessary to deter others who may be tempted to engage in similar criminal conduct.

### C. Avoiding Sentencing Disparities Among Similarly Situated Defendants.

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records

7

who have been found guilty of similar conduct." That subsection "is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Benson*, 591 F.3d 491, 505 (6th Cir. 2010). A court's careful review of the guideline range "necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Consideration of stiffer white-collar penalties applies particularly to public corruption cases. In November 2004, the Sentencing Commission amended the guidelines to increase the punishment for corrupt public officials. The Commission explained that "public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses," especially when compared with other white-collar crimes. USSG, App'x C, Vol. III, at 82 (Amendment 666). The Commission thus increased the base offense level for public officials, like Wimberly, because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

Judges in this district, where public corruption is a pervasive problem, have recognized the merit of imposing stiff penalties on defendants who betray the public's trust—especially for public officials running bribery schemes.[1] For example:

- **Richard Sollars.** In October 2024, former Taylor mayor Sollars was sentenced to 71 months for conspiring to accept $85,011 in bribes, and engaging in a wire fraud scheme that netted him $70,362.98.

- **John F. Kennedy.** March 2023, former Detroit police lieutenant Kennedy was sentenced to 30 months for accepting $14,950 in bribes in connection with a corruption scheme in the towing industry.

- **Dean Reynolds**. In February of 2019, former Clinton Township trustee Reynolds was sentenced to 17 years in prison for running four bribery schemes with a trash contractor, an engineering contractor, and a towing contractor. In total, Reynolds unlawfully collected approximately $130,000 in money and legal services.

- **Herbert Worthy.** In January 2011, former Ecorse mayor Worthy was sentenced to 18 months for accepting more than $30,000 in cash bribes.

Similarly, Wimberly is precisely the type of defendant the Commission sought to punish and deter. The amount of money Wimberly demanded from Person A also sets him apart and earns him a significant

---

[1] https://www.macombdaily.com/news/copscourts/u-s-attorney-michigan-leads-nation-in-public-corruption-cases/article_65d3a10e-8335-11e9-b217-5f2445809a89.html;

9

sentence. While he only obtained one-half of the $100,000 he solicited, this sum is significant and demonstrates the comfort and brazenness that characterized Wimberly's criminal demands. A sentence of 37 months would be consistent with comparable corruption cases, as well as with Wimberly's criminal conduct.

## IV.   Conclusion

The government requests a sentence of 37 months in prison.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

*/s/Eaton P. Brown*
Eaton P. Brown
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9100
Email: eaton.brown@usdoj.gov

Dated: August 5, 2025

## CERTIFICATE OF SERVICE

I certify that on Tuesday, August 05, 2025, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to the attorneys of

record.

Respectfully submitted,
Jerome F. Gorgon Jr.
United States Attorney

*s/ Eaton Brown*
Eaton P. Brown
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
eaton.brown@usdoj.gov
(313) 226-9184
P66003