UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                        Plaintiff,

          v.                                          CR. NO. 23-20562
                                                      HON. LINDA PARKER

PATRICK WIMBERLY,

                        Defendant.

_____/

SENTENCING MEMORANDUM

Patrick Wimberly's history is inextricably intertwined with the history of the city of Inkster, where he was born and raised. His maternal grandmother, Pearl Barden, first came to Inkster from Georgia in 1945 as part of the Great Migration.  Now 95 years old, Pearl still lives in Inkster in the home in which she was raised. She raised 12 children in that home and remains the center of a family that currently includes over 49 grandchildren, great-grandchildren, and great-great-grandchildren.  Pearl was overjoyed when Patrick, one of her oldest grandsons, became mayor of Inkster in 2019.  She had watched him work for years on behalf of city residents at a nonprofit organization, in the school district, and on city council, and his election to the position of mayor was a source of tremendous pride.

As mayor, Mr. Wimberly worked to develop programming for residents, reduce blight, encourage business development and expansion, and strengthen the city's infrastructure.  The work was there - Inkster has historically struggled with high rates of crime, a lack of affordable housing, and unemployment.  The Inkster School District was dissolved in 2013, having been deemed "financially unviable" due to declining enrollment and a mounting debt.  But those daunting statistics could not diminish Inkster's true value – the residents, many of whom had lived there for decades like Mr. Wimberly and his family and believed it to be a place worth a fight.  As mayor, Mr. Wimberly worked alongside those residents at city council meetings, street festivals, youth sporting events, business development meetings and citywide holiday celebrations.

During his tenure as mayor, Mr. Wimberly was approached regarding his willingness to use his official role to influence the purchase of a 14-acre undeveloped piece of property owned by the city.  He was approached by a cooperating informant who indicated he had an "investor" - in reality, an undercover law enforcement officer (hereinafter "UC") - who said he wanted to develop the property into a multi-use complex, with housing and businesses for Inkster residents. The UC proposed paying Wimberly $100,000 spread out over 10 months, and in return sought Mr. Wimberly's advice and influence in the bidding process.  Mr. Wimberly and the UC met a number of times, and the UC spun an exciting tale about his plans for the Inkster property –

2

there would be a mix of government-subsidized and private-pay housing, a coffee shop, a cigar bar, which would bring additional jobs for city residents. The UC shared that Inkster was "the next hotspot" and this development was just the beginning. But there was no actual plan – for the UC or anyone else – to purchase the piece of property at issue. It had gone undeveloped for decades and remains barren today.

Patrick Wimberly entered a guilty plea to one count of theft or bribery concerning programs receiving federal funds, in violation of 18 U.S.C. § 666. He will be sentenced on August 14, 2025. The Probation Department has calculated the advisory guideline range as 37 to 46 months in custody. For the reasons set forth below, a custodial sentence of a year and one day is more than sufficient to meet the sentencing goals set forth in 18 U.S.C. § 3553(a). The goals of sentencing – punishment, protection of the public, deterrence, and rehabilitation – can be met by a sentence of that length followed by a term of community supervision.

## I.      Patrick Wimberly's History and Characteristics

Mr. Wimberly was born in Inkster and raised primarily by his mother, grandmother and a network of aunts and uncles. Wimberly's biological father was not present during his childhood and played no role in raising him. When Mr. Wimberly was young his mother became involved with Wendell Thompson, who took on the unofficial role of stepfather. Unfortunately, Thompson's presence in Mr. Wimberly's

life was not a bright spot.  Thompson was a drug dealer who brought his activities into the home he shared with Mr. Wimberly and his mother.  Thompson involved both Mr. Wimberly and his mother in his illegal activities, and Mr. Wimberly recalls being made to count Thompson's drug proceeds at an early age.  Thompson was also physically and verbally abusive to young Mr. Wimberly.  PSR ¶ 33.  Mr. Wimberly's mother developed an addiction to heroin during this time and continued to fight that illness for the rest of her life.

As destructive a force as Wendell Thompson was, he did contribute something wonderful to Mr. Wimberly's life – he fathered Wimberly's twin brothers, Wade and Antonio, who were born when Mr. Wimberly was seven years old.  PSR ¶ 33.  Mr. Wimberly has felt a special bond to and responsibility for his brothers, particularly given their lack of a positive father figure.

When Mr. Wimberly was a teenager, his mother and grandmother became increasingly concerned about his future if he remained in Inkster, given an undeniable increase in violence and drugs in the community.  Mr. Wimberly was sent to Virginia to live with his maternal aunt and her husband, who held a prominent role with NASA. PSR ¶ 36.  He spent the first two years of high school in Virginia. With his junior year in high school approaching, Mr. Wimberly felt compelled to return to Inkster. While he was excited to reunite with friends at Inkster High School, the strongest motivation for returning was his concern for his younger brothers, who were experiencing significant

neglect due to their parents' drug use and related activities. PSR ¶ 35.  The next few years were rough – Mr. Wimberly scrambled to assist in caring for his brothers financially and they often lived between relatives' homes.  He eventually dropped out of high school and later earned his GED.  PSR ¶ 35, 46.

Mr. Wimberly's role in the lives of his brothers was more of a father than a brother – he attended their parent-teacher conferences, coached their sports, and helped them with homework.  By the time his brothers reached high school, Mr. Wimberly was working as a custodian and a hall monitor in Inkster Public Schools. He not only mentored his brothers but began mentoring other young men in their school as well.  This marked the unofficial start of what would become Mr. Wimberly's chosen career path across nonprofit organizations, schools, volunteer organizations, and ultimately, Inkster's City Hall. His was a career path that focused on recognizing the potential of people and connecting them with resources to provide them with a path to success.

Given the absence of a strong paternal presence in his own life, Mr. Wimberly was determined to be present in the lives of his own children.  He married his high-school sweetheart in 2000, when he was 26 years old, and immediately took on the role of father to his wife's three-year old daughter, Diamond-Jade.  The couple had another child, son Patrick (currently 20 years old), before they divorced in 2010.  Mr. Wimberly has a third child, daughter Priya, who recently graduated from high school.  Wimberly

is extremely close to his children – Diamond-Jade and her young child lived with him for a lengthy period, and he sees or speaks to all of his children daily.  See PSR ¶ 37-38.

The PSR confirms Mr. Wimberly's extensive employment history at PSR ¶ 48-54.  He has worked consistently in a variety of jobs.  The instant case obviously impacted Mr. Wimberly's employability, but it has not stopped him from working to support himself.  Of late, he has worked as an Uber driver and as the property manager of a large commercial space that he and others are developing as an entrepreneurial hub within the city of Inkster.  The property has hosted a variety of events, including pop-up opportunities for local Inkster-based vendors to sell their items and connect with other small business owners.

In addition to the sentencing video filed with the Court, attached as Exhibit C, a number of people have submitted letters of support on behalf of Mr. Wimberly.  See, Exhibit A.  These letters, from friends, family members and community members, speak volumes about Mr. Wimberly's role in his family and the community.  They reveal that Mr. Wimberly has consistently stepped up to assist family and community members when they needed it most.  The individuals who have written letters of support note their unwavering support for him, but also their acknowledgement of his wrongdoing. In their words:

> Patrick was raised by a mother who struggled with addiction.  He grew up facing the harsh realities that too many Black men experience in underserved communities.  But rather than be consumed by those odds,

6

Patrick rose above them.  He transformed his pain into purpose.  As Transportation Director for the Inkster School District, he mentored youth, offering them the very hope he once searched for.  He became the adult he once needed – a safe, encouraging presence for young people navigating difficult circumstances.

- *LaGina Washington, Mr. Wimberly's Fiancée*

He has pointed a lot of specialists in the right direction when trying to navigate how to get our young males on the right path with finding employment, school enrollment, and housing which is a big thing with our foster youth aging out of the foster care system. He has specifically helped me with a very troubled young male who was on the wrong path.  This young man now owns his own business  . . .

- *Layla Wright, State of Michigan service specialist*

I was particularly moved by his sincere concern for the residents of Inkster making sure homeowners in danger of losing their homes were given more time to raise delinquent taxes to keep them. . . A large population of Inkster are seniors and Mr. Wimberly instructed me to always forward their calls if they preferred to speak with him directly. He felt particularly responsible for making sure they were heard and received help quickly.

- *Ivy Rasool, Former Administrative Assistant at Inkster City Hall*

On a very personal note, my daughter Zuri lost her father at a young age. Despite not being her biological family, Mr. Wimberly has never missed a single holiday or special occasion to make sure Zuri feels remembered and loved.  He has stepped in to brighten her life in ways that words truly cannot express.

- *Elonda Fetvi, Friend and Community Member*

One especially impactful example of his character occurred approximately four or five years ago, when the Inkster Community Youth Football League experienced an overwhelming registration of more than 200 children – despite having resources to support only half that number.  This program plays a vital role in keeping local youth engaged, safe, and off the streets.  When Patrick learned of the shortfall, he stepped up without hesitation and personally sponsored 100 children so that no one would be turned away.

- *James Richardson, Inkster resident*

Just a few months ago our church faced a tragic issue with the power in the building. While visiting our church, Patrick heard the issue announced and personally worked tirelessly with all parties involved to remedy this great issue. His support saved the church a possible eviction due to no power and months of stress and finances . . .He attends community meetings and spends time engaging in dialogue with those who have no voice.

- *Art Wilson, Pastor of The Internation Church of Metro Detroit*

When I left the city, I had lost all hope for my community, to the tune of never coming back to it, but with this Mayor, Mayor Patrick Wimberly, my enthusiasm, my thoughts, my energy and my hope for the city of Inkster, knew no bounds. . . He felt hurt when the city hurt, or when a life was taken, you could not only see it in his face, but you could feel it and hear it in his voice when he would vent about it.

- *Trina Hill, former Inkster resident, member of Inkster High School All Class Reunion Committee*

In a city that has experienced so much hardship, Patrick has become a source of hope and guidance – especially for young men who often feel like they have no future to look forward to. His care, his wisdom, and his presence matter.

- *Clarice Rochell, Friend and Community Member*

The beacon of light that has been brought to Inkster due to Mr. Wimberly's intervention is one of economic advancement for Inkster residents and all of Southeast Michigan residents for years to come.

- *Jason Dixon, CEO of Strategic Alliance Community Development Corporation*

---------------------------------------------------

The attached letters speak about tangible improvements that Patrick Wimberly brought to his community. When he saw breaks in service, or particular segments of the community in need, he stepped up to ensure those gaps were filled. Two projects

8

that were particularly important to Mr. Wimberly were the development of a senior service center (discussed at Exhibit C, Sentencing Video, beginning at 3 minutes, 52 seconds) and the return of Inkster Summerfest (discussed at Exhibit C, beginning at 5 minutes, 03 seconds).

In the years since the offense, Mr. Wimberly's life has changed in significant ways.  On of his younger brothers, Wade Anthony, died in December 2023 from an accidental fentanyl overdose.  Mr. Wimberly found his brother's body when he went to check on him, having had not heard from him in several days.  The death devasted Mr. Wimberly, who believes that his brother had been struggling with addiction in silence. He has suffered the deaths of multiple other family members as well, losses which have served as consistent reminders of the importance of family and friends.  Most significantly, he has lived with the impact of this prosecution and the inevitability of punishment for his actions.  He accepted responsibility early on for his criminal acts and admitted guilt to this Court.  He has prepared his children, family and friends for the reality that he will serve time in prison for his actions.  He has accepted that reality as the natural consequence of his own actions and has lived every day of the last few years with the impact of his choices.

## II.     The Nature and Circumstances of the Offense

While acting as Mayor of Inkster, Patrick Wimberly agreed to accept $100,000 in exchange for influencing the sale of a piece of city-owned property[1]. He was propositioned by a confidential informant, who then brought his "investor" – the undercover law enforcement agent or "UC" – into a series of meetings.  Wimberly accepted a total of $50,000 over the course of seven months, made in increments of $5,000 initially, and then increasing to $10,000.   The payment arrangements were proposed by the UC, and Wimberly readily agreed.

The property at issue, pictured below, is a 14-acre parcel that has gone undeveloped during Mr. Wimberly's lifetime.[2]

---

[1]   The Government's Sentencing Memorandum provides a brief description of the Neighborhood Stabilization Program.  The property at issue here was not part of the Neighborhood Stabilization Program, which instead deals with properties lost by homeowners to tax foreclosure.  That program, (detailed here: https://www.cityofinkster.com/DocumentCenter/View/7109/Neighborhood-Stabilization-Program-PDF) is unrelated to  Wimberly's offense.

[2]   The property at issue is further pictured and discussed in Exhibit C, Sentencing Video, beginning at 7 minutes, 05 seconds.



It was and is an eyesore, prominently located on Cherry Street and Inkster Road, and used as a dumping ground by people in Inkster and other communities.  In the years since the offense, the property remains undeveloped, and upon information and belief, no bids have been submitted.  The city currently stores Department of Public Works vehicles there, and the parcel is no longer available for purchase on the City of Inkster's website.

Mr. Wimberly has fully accepted responsibility for his actions and there is simply no justification for his criminal conduct.  That said, it is crucial that this Court understand the entire picture of what occurred.  Law enforcement agents appealed to Mr. Wimberly's desire to improve his community when they approached him with the land development deal at the heart of this case.  Over a series of meetings, where the UC spent well over $10,000 in government funds on alcohol, food and entertainment on Mr. Wimberly and the CI, the UC pushed his desire to "revolutionize" the city of

Inkster.  He spoke about using his developer and architect to make his "vision" for the property come alive.  Mr. Wimberly and the UC talked at length about bringing economic growth to Inkster through the jobs and tax revenue that would be associated with the property's development.

Public corruption cases are incredibly serious.  They erode public trust, and depending on the circumstances of the offense, can deprive vulnerable communities of much needed funds and development. Often, the defendants in public corruption cases often act with perceived impunity – boldly using public funds to increase their own personal wealth and amass assets without regard for the needs of the people they had committed to serve.

This case is simply not a "typical" public corruption case - it falls outside the heartland of public corruption cases for several reasons.  First, the money at issue came only from the government as part of their investigation.  It was not diverted from an intended use for the city of Inkster.  Second, Wimberly was posturing when he said he was holding the property "open" for the UC and giving him an advantage over other purchase proposals.  In reality, there were no other proposals.  Third, Mr. Wimberly could not have single-handedly ensured the sale of Inkster-owned property – once submitted, a bid for purchase necessarily goes through number of steps, including submission to the city planner, followed by a site plan review, review by the planning commission, planning department, and then to the City Council for a public hearing.

Finally, Mr. Wimberly's motivation in this case wasn't just the promise of a considerable amount of money for himself – it was the desire to see a piece of undeveloped property transformed into something that would benefit the community of Inkster.

Mr. Wimberly fully accepts responsibility for his criminal actions – he accepted an offer of $100,000 from an undercover law enforcement officer in exchange for a promise on his part to assist in securing the purchase of a parcel of land. And that is the extent of what occurred here – no Request for Proposal ("RFP") was ever drawn up by the undercover "buyers" and presented in any official capacity. Though Mr. Wimberly assured agents that he was "holding" the property for them as other purchasers were interested, that simply wasn't true. He could not have prevented anyone from submitting a proposal to purchase the property, and once submitted every proposal would have followed the same vetting process. Mr. Wimberly simply was not in a position to guarantee that a particular RFP would be ultimately accepted by the City Council. Significantly, there had been no offers to purchase the property prior to or during Wimberly's tenure as mayor.

The sum of money promised to Mr. Wimberly - $100,000 – was large and undeniably valuable to him. But the development of the parcel, and what it would have meant to the people of Inkster, was priceless. The undercover officer sold Mr. Wimberly a dream – that a barren piece of land would be turned into a multi-use

development, housing families, that the property would be the first step in revitalizing the area.

Ironically, had the offer been real, the UC would likely not have needed Mr. Wimberly's influence to secure the target property.  His proposal for the development was appealing and his sales pitch was strong.  In hours of recorded conversations, the UC spoke of his excitement about the project, and the fact that his developer has already been looped in and together they would oversee the project.  The UC echoed Mr. Wimberly's concerns that the city doesn't need another tow yard and emphasized that his commitment was "long term."  He shared that mid-year, he and Wimberly would be at the site "with shovels," and that a year later they would have residents.  The UC explained his vision that the property would provide mixed-income housing, emphasizing that he wants "a mom with two kids" to live there - someone they would have faith would "get out of there and be on [her] own two feet."  The UC explained that the property would be built to accommodate businesses coming in – in his words "Black owned, Black pride," and that "it wasn't about the money" but about the segment of the population "that wasn't being served."

14

III.     **Sentencing Considerations**

A. **The Presentence Report and Sentencing Guideline Calculations**

The Probation Department has calculated an advisory guideline range of 37 to 46 months in custody.  See PSR ¶ 59.  Mr. Wimberly does not disagree with this calculation, and there are no remaining objections to the PSR.

B. **A Discussion of Other Public Corruption Cases**

Mr. Wimberly's sentencing request – a term of one year and one day in prison – is not inconstant with sentences imposed in other public corruption cases:

*United States v. Burcroff*, 22-20253 (EDMI, J. Hood).  Burcroff was the mayor of Romulus, Michigan.  According to the Government's Sentencing Memorandum in that case (R.21), Burcroff misappropriated tens of thousands of dollars in campaign donations and spent the money on vehicles used for personal purposes, a family wedding, a Florida vacation with friends, and a yacht club membership.  His guideline range was 8 to 14 months in custody - he received a sentence of 3 years' probation.

*United States v. Herbert Worthy*, 09-20449 (EDMI. J. Cohn).  Worthy was the mayor of Ecorse, Michigan and misappropriated funds meant to pay for public services such as garbage collection, snow plowing and water service.  The Government's Sentencing Memorandum (R. 74) does not list an exact loss amount, though the Complaint (R.1) states that Worthy accepted $10,000 in cash, a Lexus, and conspired with a co-defendant to divert millions of dollars in city contracts to two of his largest campaign donors (and

15

eventual co-defendants), who then structured more than $250,000 in cash withdrawals from their own business accounts.  Mr. Worthy's advisory guideline range was 46 to 57 months; he was sentenced to 18 months in custody.

*United States v. Bruno,* 09-00029 (NDNY, J. Sharpe).  Joseph Bruno was New York State Senate Majority Leader, convicted in 2009 of two counts of honest services mail fraud. As alleged at trial, he accepted payments worth $280,000 for consulting work and other goods he never performed or delivered by exploiting his official position for personal gain, including by directing state grants to entities in which Bruno's bribers had an interest. The court calculated an offense level of 30 and a Guidelines Range of 97-121 months. (R. 306, Sentencing Transcript, at 85).  The court ultimately imposed a sentence of 24 months. (R. 306, Sentencing Transcript, at 94).

### C.    The Collateral Consequences of a Felony Conviction

The details of Mr. Wimberly's criminal case have been widely reported by local, state and national news outlets.  An internet search reveals numerous print and internet articles and televised news coverage.  Earlier this week, yet another news article was published, this time recklessly suggesting that Mr. Wimberly provided cooperation to the government against his own former assistant and others.  This is the type of story that will follow Mr. Wimberly forever.[3]

---

[3]  See,  Snell, Robert. "Lansing politico Saif Alsenad quits amid FBI bribery probe involving ex-Inkster mayor." Detroit News, August 4, 2025,

The collateral consequences of a felony conviction extend far beyond a custodial sentence. These consequences can touch nearly every aspect of an individual's life, including access to employment, housing, and the loss of civil rights.

For Mr. Wimberly, there are specific consequences that will impact him far into the future.  MCL Article XI § 8 renders individuals ineligible for election and certain positions of public employment for 20 years from the date of a conviction involving dishonesty, deceit, fraud, or a breach of public trust.  Thus, this conviction will not only prohibit him from running for elected office, but from employment in other public sectors.

The remorse and shame that Mr. Wimberly feels for his conduct is palpable. Prior to ever pleading guilty in this case, he acknowledged his criminal conduct to his family.  See, Exhibit C, Sentencing Video, 9:00 minutes.  He took responsibility to the community of Inkster in a Facebook live event and a community "speak out".  See, Exhibit C, Sentencing Video, 11:00 minutes.  He recognized his need to be accountable for his actions to the people closest to him and those he had served.  He knew that his actions harmed his community, creating intense feelings of hurt, disillusionment, and distrust.  The frank discussions that he had were a first step towards atoning for his

---

https://www.detroitnews.com/story/news/local/wayne-county/2025/08/04/lansing-politico-quits-amid-fbi-bribery-probe-involving-ex-inkster-mayor/85499885007/

actions, with the hope of one day restoring their faith in him. Many of Mr. Wimberly's family members, friends and constituents were shocked, disheartened and angry when they learned of his offense conduct.  It is a testament to his character and his remorse that he has spoken honestly and openly about what he has done.  As a result, he has an immense support system of individuals who are aware of what he did and are nonetheless hopeful for his future.

**D. The Appropriate Sentence**

Mr. Wimberly requests a sentence of one year and one day in custody, to be followed by a term of supervised release.  A sentence of this nature will accomplish all of the sentencing goals set forth in 18 U.S.C. § 3553(a).  It will represent a significant punishment, it will deter both Mr. Wimberly and others in the community from similar acts, and it will allow for rehabilitation.

**1.      Incapacitation – to prevent from functioning in a normal way.**

Mr. Wimberly does not need to be imprisoned beyond one year and one day to achieve the goal of incapacitation or otherwise to protect the public.  <u>See</u>, 18 U.S.C. § 3553(a)(2)(C).  Without question, he made a series of wrong choices in his violation of the law, but he made the right choice when he immediately accepted responsibility for his conduct, made clear his desire to plead guilty, and began the process of examining his conduct.

Mr. Wimberly has no criminal history. PSR ¶ 26.  He has never been separated from his family for an extended period of time.  He is 51 years old and now has a felony conviction.  All of this – the felony record, the pain of separation from family, the loss of liberty – he has brought on himself and serves to punish him above and beyond any time spent in prison.  A sentence that includes a year and one day in custody is a significant punishment in this case, and for Mr. Wimberly as an individual.

**2.      Deterrence – the act of discouraging an action or event through instilling doubt or fear of the consequences.**

The proposed sentence is more than enough to assure the Court of Mr. Wimberly's specific deterrence from future misconduct.  <u>See</u> 18 U.S.C. § 3553(a)(2)(B).  His misconduct in this case is not a true indicator of how he will conduct himself in the future.  His sincere remorse is also an indication that he has learned his lesson and will not act again to violate the laws of the United States.

In terms of general deterrence, Mr. Wimberly understands the need for his sentence to send a message to the community at large.  A sentence of one year and a day can effectively do so, especially in this case, where there is no need to send the message that repeat offenders will be punished more harshly.  In general, certainty of punishment is more impactful than the length of punishment.  Even the Department of Justice recognizes that "The certainty of being caught is a vastly more powerful deterrent than the punishment."  National Institute of Justice, *Five Things About*

*Deterrence* (June 2016), available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence. In addition, the certainty of a conviction for a federal crime, particularly a felony, has a significant deterrent effect on others.

The media has extensively covered this case. That coverage has undoubtedly prompted discussions within the community and beyond about Mr. Wimberly's elected official status, his criminal conduct, and the penalties he faces.  The news stories regarding Mr. Wimberly have undoubtedly communicated to the public, and to public officials, the certainty of being caught if you engage in fraud, and the inevitability of punishment.

### 3.  Retribution – punishment inflicted on someone as vengeance for a wrong or criminal act.

Section 3553(a)(2)(A) addresses "retribution" and requires the Court to impose a sentence to reflect the seriousness of an offense, promote respect for the law, and provide just punishment. This is, without question, a very serious offense.   A sentence of one year and a day communicates the seriousness of the offense, particularly to someone with no criminal history.  It sends a very clear message that no one – regardless of age, lack of criminal history and a history of exemplary acts – can escape punishment when they take money in connection with their work as a public official.  It promotes respect for the law as it is a custodial sentence that results in the loss of liberty.  It

20

provides significant punishment, particularly for a first-time offender who is 51 years old.

### 4.   Rehabilitation – the act of restoring someone to health or normal life through training and therapy after imprisonment, addiction or illness.

This case presents no particular need for rehabilitation in the sense that term is most commonly used in criminal cases. See, 18 U.S.C. § 3553(a)(2)(D).  Mr. Wimberly has no history of drug or alcohol use that suggests a need for treatment.   He has owned his actions, not just by pleading guilty but by his comments to this Court and the Inkster community:

> During my time in office, you entrusted me with a sacred duty — to lead with integrity, to serve without self-interest, and to put the needs of our community above all else. It was an honor to be given that trust, and it is a trust I broke. I crossed a line that should never be crossed, and in doing so, I failed you.
>
> I won't make excuses. What I did was wrong. It was a betrayal of your faith in me, and it tarnished not only my name but the dignity of the office I held and the city we all love. For that, I am deeply sorry.
>
> To the hard-working families, to the young people who looked up to me, to the elders who have seen this city through its hardest times — I apologize from the bottom of my heart. I allowed personal weakness and poor judgment to outweigh my responsibility to you, and I am committed to accepting the consequences of my actions.
>
> This letter isn't an attempt to seek sympathy. It is an attempt to acknowledge the hurt I caused and to begin the slow, necessary work of making amends. I know trust cannot be rebuilt overnight, and perhaps for some of you, it never will be — but I want you to know that

21

I will spend the rest of my life trying to give back in any way I can, even if it's from outside the public eye.

Inkster is a resilient city. You've endured more than most — economic hardship, neglect, broken promises — and yet, you still stand strong. You still believe in the power of community. That's what makes this city beautiful. And that's what makes my failure so heavy to bear.

I hope that in time, my remorse will speak louder than my wrongdoing. I hope to one day be seen not only for my mistakes, but for the growth that came after them. I ask for your forgiveness, not because I deserve it, but because I want to be better — for myself, and maybe, one day, for you.

See, Letter from Patrick Wimberly, attached as Exhibit B.

A prolonged period of time spent in prison will not encourage rehabilitation, particularly given the circumstances of this case and the unique nature of Mr. Wimberly as an offender.  The Court could consider a requirement of community service during the required term of supervised release – that condition would encourage Mr. Wimberly's continued commitment to his community and provide an opportunity for redemption.

**IV. Conclusion**

      For the reasons stated above, a sentence of one year and a day is "sufficient, but not greater than necessary" to satisfy the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

                          Respectfully Submitted,

                          Federal Defender Office
                          Attorneys for Defendant

                          *s/Nancy L. McGunn*
                          *s/Natasha Webster*
                          NANCY L. MCGUNN (P55156)
                          613 Abbott Street, 5th Floor
                          Detroit, Michigan  48226
                          313/967-5846
                          E-mail: nancy_mcgunn@fd.org

      Dated:  August 7, 2025

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,

     v.                                    CR. NO. 23-20562
                                          HON. LINDA PARKER


PATRICK WIMBERLY,

                    Defendant.
_____/


## CERTIFICATE OF SERVICE

       I hereby certify that on August 7, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to opposing counsel of record.

                                     s/Natasha Webster